**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| ———————————————— | x | |
| Sonia Cauchi and Stephanie Branton, individually on behalf of themselves and all others similarly situated, | : : : | |
| | : | Case No. |
| Plaintiffs, | : : | |
| | : | |
| v. | : | |
| | : | **CLASS ACTION COMPLAINT** |
| L'Oreal USA, Inc., | : | |
| | : | <u>**JURY TRIAL DEMANDED**</u> |
| Defendant. | : | |
| | : | |
| | : | |
| ———————————————— | x | |

Plaintiffs Sonia Cauchi and Stephanie Branton (hereinafter collectively the "Plaintiffs"), individually on behalf of themselves and all others similarly situated, by their attorneys, allege the following upon information and belief, except for those allegations pertaining to Plaintiffs, which are based on personal knowledge:

<u>**NATURE OF THE ACTION**</u>

1.      This action seeks to remedy the deceptive and misleading business practices of L'Oreal USA, Inc. (hereinafter "Defendant") with respect to the marketing and sale of Defendant's waterproof mascara line of products throughout the country, including, but not limited to, the following products (hereinafter collectively the "Products"):

- L'Oréal Voluminous Waterproof Mascara;

- L'Oréal Voluminous Lash Paradise™ Waterproof Mascara;

- Maybelline Volum' Express the Falsies Waterproof Mascara;

- Maybelline Volum' Express Total Temptation Waterproof Mascara;

- Maybelline Great Lash Waterproof Mascara; and

- Maybelline Total Temptation Waterproof Mascara.

2.      Defendant does specifically list both the active and inactive ingredients of these Products but fail to disclose that the Products contain Per and Polyfluoroalkyl Substances (hereinafter "PFAS").

3.      PFAS are a widely recognized group of man-made synthetic chemicals that are made up of incredibly dangerous substances, especially in the context of applying them to the skin. PFAS offers no therapeutic cosmetic benefit whatsoever.  Rather, PFAS are harmful toxins.

4.      PFAS have been recognized, acknowledged, and accepted as well-known health hazards to humans, the environment, and animals for decades, dating back to the 1950's.[1]

5.      To that effect, PFAS can be toxic to humans and have adverse effects on humans' bodies when they bioaccumulate, even at very low levels.

6.      PFAS can bioaccumulate in the body through mere application to the skin and by absorption through tear ducts; ingestion is not required.  Thus, PFAS exposure risk is particularly high when PFAS are applied near a person's eyes through mascara products, such as Defendant's Products, because the application subjects the user to PFAS exposure through skin and tear duct absorption.

7.      Once PFAS do bioaccumulate in the human body, PFAS are known to cause cancer, liver damage, decreased fertility, increased risk of asthma, and thyroid disease.[2]

8.      For example, "[i]n a series of five reports the [C-8 Science] panel noted a "Probable Link" between exposure to C8 [Perfluorooctanoic Acid (PFOA) which is a PFAS] and pregnancy-induced hypertension, thyroid disease, ulcerative colitis, testicular cancer, kidney cancer and high cholesterol"[3]

---

[1] https://www.ewg.org/research/decades-polluters-knew-pfas-chemicals-were-dangerous-hid-risks-public
[2] https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-grandjean/
[3] *See*  https://odh.ohio.gov/wps/wcm/connect/gov/c7ed2904-c1ca-43bc-ae3b-5315d35fd71d/C8community.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_M1HGGIK0N0JO00QO9DDDDM3000-c7ed2904-c1ca-43bc-ae3b-5315d35fd71d-mjNdjuE

9.    Moreover, under the U.S. Environmental Protection Agency's (hereinafter "EPA") Guidelines for Carcinogen Risk Assessment, there is "Suggestive Evidence of Carcinogenic Potential" for PFAS in humans.[4]

10.    Despite the widespread knowledge of the dangers of PFAS, which is highlighted above and delved into greater below, Defendant still did not include on the Products' packaging or ingredients lists the presence or risk of containing PFAS in the Products.  As such, Defendant acted negligently and/or intentionally to deceive consumers, including Plaintiffs and those similarly situated (hereinafter "Class Members"), through its misleading omissions on the Products' packaging and ingredients lists.

11.    Only Defendant had exclusive knowledge of the contents and formula of its Products, including whether they contained or were at a risk of containing PFAS.

12.    Defendant, as described in greater detail below, also had exclusive knowledge of its ingredient suppliers and could have obtained information from their suppliers about the contents of the ingredients, including whether the Products contained or were at risk of containing PFAS.

13.    Nevertheless, despite Defendant knowing of the presence and/or material risk of containing PFAS in the Products, Defendant still omitted PFAS from the ingredients list.

14.    Consumers like Plaintiffs trust manufacturers such as Defendant to sell Products that accurately inform consumers what is in the Products, including whether they contain or risk containing known toxins and carcinogens such as PFAS.

15.    Moreover, consumers like Plaintiffs and Class Members are unable to determine nor identify the contents of the Products and decipher whether they are at risk of the dangers

---

[4] U.S. Environmental Protection Agency Office of Water Health and Ecological Criteria Division, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA) (May 2016), https://www.epa.gov/sites/production/files/2016-05/documents/pfoa_health_advisory_finalplain. Pdf.  Perfluorooctane sulfonic acid ("PFOS") is also considered a PFAS chemical.

presented by PFAS at the point of sale due to the Products' omission and failure to disclose the presence or risking of containing PFAS on its packaging and/or ingredient lists.

16.     As such, Plaintiffs and Class Members certainly expect that the waterproof mascara cosmetic products they purchase will comply with its labeling and not contain any knowingly harmful substance or carcinogen like PFAS.

17.     Defendant specifically manufactures, sells, and distributes the Products in this manner using a marketing and advertising campaign centered around claims that appeal to health-conscious consumers.

18.     For example, Defendant's marketing and advertising campaign includes the one place that every consumer looks when purchasing a product—the packaging and labels themselves. Consumers expect the ingredient listing on the packaging and labels to accurately disclose the ingredients within the Products and to warn of any potential health effects from the ingredients.

19.     However, Defendant's advertising and marketing campaign is false, deceptive, and misleading because the Products contain PFAS, which Defendant does not list nor mention anywhere on the Products' packaging or labeling.

20.     Plaintiffs and Class Members relied on Defendant's misrepresentations and omissions of what is in the Products when they purchased them.

21.     Consequently, Plaintiffs and Class Members lost the entire benefit of their bargain when what they received was a waterproof mascara product contaminated with known harmful toxins.  Alternatively, Plaintiffs paid a premium for Products that were not as they were represented to be.[5]

---

[5] By way of example and to plausibly plead that a price premium exists in this case, Loreal's Voluminous Waterproof Mascara costs approximately $9.99. *See* https://www.ulta.com/p/voluminous-volume-building-waterproof-mascara-14353?catargetid=330000200002232596&CAPCID=438981189005&CATCI=aud-

4

22.     Accordingly, Defendant's conduct violated and continues to violate, *inter alia*, New York General Business Law §§ 349 and 350.  Defendant also breached and continues to breach its warranties regarding the Products.  In addition, Defendant has been and continues to be unjustly enriched.

23.     Plaintiffs bring this action against Defendant on behalf of themselves and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## FACTUAL BACKGROUND

**Defendant's Misleading Advertising and Marketing Campaign for the Products**

24.     Defendant is a conglomerate and the one the largest cosmetic companies in the world, which includes generating over seven billion dollars in sales per year in the United States.[6] Defendant also owns and operates over 30 beauty brands, including the Maybelline mascara products at issue.[7]

25.     According to Defendant, its mission is to bring "innovative, effective, high quality Products to our consumers around the world."  To do so, Defendant selects suppliers, "who are experts in their field" to ensure "the quality, effectiveness, and traceability of our products."[8]

26.     Defendant also develops all its own products and has research and innovation centers all over the world.[9]  Through its research, Defendant claims it is "providing a continuously

---

818838764052:dsa-896668798224&CAAGID=105608774288&CADevice=c&gclid=CjwKCAjw9qiTBhBbEiwAp-GE0fjbSBM8HxgDOs5EeHpibDvokx_BGUbbXcK9PlgfJ_ekZTjZPdRo-RoCvWsQAvD_BwE. However, there are much cheaper similar products available.  For example, Wet n Wild's "MEGA LENGTH WATERPROOF MASCARA" only costs $3.79. https://www.wetnwildbeauty.com/mega-length-waterproof-mascara.html?utm_source=linkshare&utm_medium=affiliate&publisher_id=2116208&ranMID=43590&ranEAID=TnL5HPStwNw&ranSiteID=TnL5HPStwNw-YABsZ9iBXQu.76AMOvYovw&LSNSUBSITE=Omitted_TnL5HPStwNw&utm_medium=CPA&utm_campaign=TnL5HPStwNw&utm_source=Linkshare.
[6] https://www.loreal.com/en/usa/
[7] *Id.*
[8] https://www.loreal.com/en/audiences/suppliers/
[9] https://www.loreal.com/en/beauty-science-and-technology/beauty-research-and-innovation/

improving response to the Beauty needs and aspirations of consumers, while the products they create are ever more effective, and provide the highest standards of quality and safety."[10]

27.     Defendant also takes great pride in its commitment to research and proudly states that it employs over 470 United States based researchers and scientists.[11]  For example, the L'Oréal Paris brand website states that its products are "Rooted in Science" and "based on the deepest knowledge thanks to its 4,000 researchers and 21 scientific research centers around a world."[12]

28.     Defendant also claims that "The Quality and Safety of Our Products Are Our Priority" and that it is "Going above and beyond industry standards" by "providing the best - ingredients, formulation, and performance - in each and every one of our products."[13]

29.     One of Defendant's most popular brands is its "L'Oréal Paris" cosmetics line, which consists of makeup (mascara, lipstick, foundation, etc.,), skin care (eye cream moisturizer, sunscreen, etc.), hair color (permanent and semi-permanent color, hair highlights, and root touch up, etc.), hair care (including shampoo, conditioner, hair masks, etc.) and hair style (hair gel, hair spray, heat protectant, etc.).[14]

30.     Within its "L'Oréal Paris" makeup line, Defendant offers ten different waterproof mascara products.[15]  Defendant also owns Maybelline cosmetic brand that offers mascaras.[16]

31.     Of these products, and delved into in further detail below, testing has determined that the Products contain undisclosed PFAS.

---

[10] *Id.*
[11] *Id.*
[12] https://www.loreal.com/en/consumer-products-division/loreal-paris/
[13] https://www.loreal.com/en/commitments-and-responsibilities/for-our-products/productquality-and-safety/
[14] https://www.lorealparisusa.com/
[15] *Id.*
[16] *Id.*

32. Defendant formulated, developed, manufactured, labeled, distributed, marketed, advertised, and sold the Products throughout the United States, including this district, during the Class Period.

33. The packaging, labeling, and ingredients lists of the Products that Plaintiffs and Class Members relied on when purchasing the Products were prepared, reviewed, and/or approved by Defendant and their agents, and were disseminated by Defendant and their agents through the packaging, labeling, and ingredients list that contained the misrepresentations and omissions alleged herein.

34. Defendant intended for consumers, such as Plaintiffs and Class Members, to rely on the statements and omissions on the packaging, labeling, and ingredients lists of the Products at the time of purchase. Consequently, Defendant's omissions were designed to mislead consumers, such as Plaintiffs and Class Members, when purchasing the Products. If Plaintiffs had known the truth about Defendant's concealment that its Products had or risked containing PFAS, then Plaintiffs would not have purchased the Products or would have paid less for the Products.

35. Defendant owns, manufactures, and distributes the Products and is responsible for allowing PFAS in the Products, for the omission of PFAS on the Products' labeling and ingredient lists, and for selecting and sourcing the ingredients used for the Products. Thus, Defendant knew, or should have known, that failing to disclose the presence of detectable levels of PFAS was a material omission and that it was concealing the true quality, nature, and safety of the Products.

36. To that effect, none of the Products disclose PFAS or risk of containing PFAS on the packaging, labeling, or ingredient list of the Products.

37. Instead, Defendant includes several misrepresentations in addition to the omissions of PFAS that would lead a reasonable consumer to conclude that the Products are safe and do not contain harmful PFAS.

38.     For example, Defendant's "L'Oréal Voluminous Waterproof Mascara," states that the Product is "ophthalmologist and allergy tested.   Suitable for sensitive eyes.   Tested under dermatological control for safety," as depicted below:



39.    The same deceitful statements can be found on the Maybelline Products. For example, the Maybelline "Volum' Express the Falsies Waterproof Mascara," and the "Colossal Waterproof Mascara," both state that the Products are "ophthalmologist tested. Suitable for contact wearers" as depicted below:



500VECW-00

the
**COLOSSAL**
**VOLUM'**
*EXPRESS®*

**GLAM BLACK**
**NEGRO GLAMOROSO**
**NOIR GLAMOUR**

1604722
0604 4



## WATERPROOF MASCARA

- Mega Brush instantly zooms on 7x the volume, without clumps.
- Volume-plumping waterproof formula contains collagen.
- Ophthalmologist tested • Contact lens safe

**To use:** For best results, sweep Mega Brush from root to tip for instant volume. Do not let dry between coats. Removes easily with Maybelline® New York Expert Eyes® Moisturizing Eye Makeup Remover.

TO SAFEGUARD MAYBELLINE® PURITY, RESERVE THIS PRODUCT FOR YOUR PERSONAL USE. TREAT THE APPLICATOR WITH THE HYGIENIC CARE YOU GIVE YOUR EYES. NEVER APPLY THIS PRODUCT IN A MOVING VEHICLE. DO NOT DILUTE MASCARA WITH WATER, SALIVA, OR ANY OTHER SUBSTANCE. CAP TIGHTLY AFTER USE. IF CHANGE IN ODOR OR APPEARANCE OCCURS, DISCONTINUE USE. DO NOT USE THIS OR ANY OTHER EYE COSMETIC IF YOUR EYE IS INJURED, IRRITATED, OR INFECTED. CONSULT A PHYSICIAN PROMPTLY.

## MASCARA A PRUEBA DE AGUA

- El Mega Cepillo le da a las pestañas 7 veces más volumen al instante, sin grumos.
- La fórmula a prueba de agua que aumenta el volumen contiene colágeno.
- Sometida a pruebas oftalmológicas • Adecuada para quienes usan lentes de contacto

**Aplicación:** Para mejores resultados, desliza el Mega Cepillo desde la raíz hacia la punta de las pestañas para aumentar el volumen al instante. No dejes secar entre capas.

Se retira fácilmente con Maybelline® New York Expert Eyes® Moisturizing Eye Makeup Remover.

PARA ASEGURAR LA PUREZA DE ESTE PRODUCTO MAYBELLINE®, RESÉRVALO PARA TU USO PERSONAL. AL USAR EL APLICADOR RIGETE POR LAS MISMAS NORMAS DE HIGIENE QUE USAS PARA TUS OJOS. NO TE APLIQUES ESTE PRODUCTO MIENTRAS TE ENCUENTRES EN UN VEHÍCULO EN MOVIMIENTO. NO DILUYAS LA MASCARA CON AGUA, SALIVA U OTRA SUSTANCIA. CIERRA BIEN LA TAPA DESPUÉS DE USARLA. SI OBSERVAS ALGÚN CAMBIO EN SU OLOR O APARIENCIA, DESCONTINÚA SU USO. SI TIENES LOS OJOS LASTIMADOS, IRRITADOS O INFECTADOS NO UTILICES ESTE NI OTRO PRODUCTO COSMÉTICO PARA OJOS. CONSULTA CON UN MÉDICO DE INMEDIATO.

## MASCARA HYDROFUGE

- La Mega brosse fournit aux cils 7 fois plus de volume, sans grumeaux.
- La formule volumisante hydrofuge contient du collagène.
- Testé par des ophtalmologistes • Convient aux porteurs de lentilles

**Mode d'emploi :** Pour des résultats optimaux, balayez la Mega Brosse de la racine vers la pointe pour donner un volume instantané. Ne laissez pas sécher le produit entre les couches.

S'enlève facilement avec le démaquillant hydratant Expert Eyes® de Maybelline® New York.

POUR PRÉSERVER LA PURETÉ DE CE PRODUIT MAYBELLINE®, NE RÉSERVEZ CE PRODUIT QU'À VOTRE USAGE PERSONNEL. TRAITEZ CE PRODUIT SELON LES MÊMES RÈGLES D'HYGIÈNE QUE POUR VOS YEUX. N'APPLIQUEZ JAMAIS CE PRODUIT DANS UN VÉHICULE EN MOUVEMENT. NE DILUEZ PAS LE MASCARA AVEC DE L'EAU, DE LA SALIVE OU AUCUNE AUTRE SUBSTANCE. VISSEZ BIEN LA BROSSE APRÈS USAGE. EN CAS DE CHANGEMENT DE L'ODEUR OU DE L'APPARENCE DU PRODUIT, CESSEZ D'UTILISER. N'UTILISEZ PAS CE PRODUIT NI AUCUN AUTRE PRODUIT COSMÉTIQUE POUR LES YEUX EN CAS DE BLESSURE, D'IRRITATION OU D'INFECTION. CONSULTEZ IMMÉDIATEMENT UN MÉDECIN.



G1146 1 INGREDIENTS: ISODODECANE, CERA MICROCRYSTALLINA/MICROCRYSTALLINE WAX/CIRE MICROCRISTALLINE, C9-9 ISOPARAFFIN, CERA ALBA/BEESWAX/CIRE D'ABEILLE, DISTEARDIMONIUM HECTORITE, CERA CARNAUBA/CARNAUBA WAX/CIRE DE CARNAUBA, AQUA/WATER/EAU, PROPYLENE CARBONATE, ALLYL STEARATE/VA COPOLYMER, LECITHIN, SODIUM POLYMETHACRYLATE, HYDROGENATED JOJOBA OIL, PHENOXYETHANOL, PEG/PPG-17/18 DIMETHICONE, ETHYLENEDIAMINE/STEARYL DIMER DILINOLEATE COPOLYMER, ETHYLPARABEN, POLYVINYL LAURATE, SILICA, POLYQUATERNIUM-10, SOLUBLE COLLAGEN, PANTHENOL, PROPYLPARABEN, ISOBUTYLPARABEN, METHYLPARABEN, BUTYLPARABEN, ORYZA SATIVA STARCH/RICE STARCH. [+/- MAY CONTAIN/PEUT CONTENIR: CI 77499, CI 77492, CI 77491/IRON OXIDES, CI 77742/MANGANESE VIOLET, CI 77007/ULTRAMARINES, CI 77861/TITANIUM DIOXIDE, CI 77288/CHROMIUM OXIDE GREENS, CI 77289/CHROMIUM HYDROXIDE GREEN, CI 77510/FERRIC FERROCYANIDE, MICA]. F.I.L. D162215/5 U.S. PATENTS/BREVETS AMÉRICAINS: 6,099,183; 6,227,735; 6,296,411; 6,299,370; 6,299,371; 6,305,862; 6,309,123; 6,325,562; 6,311,086; 6,345,923; 5,462,758

**MAYBELLINE®**



MAYBELLINE LLC, NEW YORK, NY 10017
DIST. MAYBELLINE CANADA, MONTRÉAL, H4T 1K5 MADE IN U.S.A.

www.maybelline.com

6M

40.     Maybelline's "Great Lash Waterproof Mascara" also states that it is "contact lens safe" and "hypoallergenic," as depicted below:



41.     All the aforementioned representations are likely to mislead reasonable consumers, including Plaintiffs, into believing that the Products are safe for use and do not contain or risk containing the carcinogenic and/or toxic PFAS not disclosed on the Products' label, packaging, or ingredients list.

11

**PFAS and Mascara Products**

42.     Defendant markets, advertises, and sells the mascara Products as beauty products that are used to thicken, lengthen, color, curl, and provide volume to eyelashes, with the goal of helping to accentuate the appearance of eyes.  Waterproof mascara specifically is a form of mascara that does not get washed off with water easily.

43.     Sales of mascara products, including waterproof mascaras, have steadily increased as consumers have become more vigilant and health conscious in terms of protecting their skin from harmful chemicals.  As of 2020, the global mascara market size was $5.7 billion USD, and it is expected to reach 6.9 billion USD by 2027.[17]

44.     Consumers have become increasingly concerned about the effects of synthetic and chemical ingredients in products that they put on and/or into their bodies.  Companies such as Defendant have capitalized on consumers' desire for healthy and safe products, and indeed consumers are willing to pay, and have paid, a premium for these products.

45.     Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains additional unlisted substances, including unsafe substances such as PFAS, especially at the point of sale, and therefore must and do rely on Defendant to truthfully and honestly report what the Products contain on the Products' packaging or labels.

46.     When consumers look at the Products' packaging, there is no mention of PFAS. PFAS are not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of PFAS in the Products.  This leads reasonable consumers to believe the Products do not contain dangerous chemicals like PFAS.

---

[17] https://www.marketwatch.com/press-release/mascara-market-in-2022-27-cagr-with-top-countries-data-what-are-the-growth-opportunities-in-the-mascara-industry-latest-142-pages-report-2022-01-20

47.    Additionally, Defendant's website does not mention PFAS in the Products.  For example, "L'Oréal Voluminous Lash Paradise™ Waterproof Mascara" product makes no mention of any contained PFAS on its product page (lorealparisusa.com) as depicted below:





48.     However, despite Defendant's representations and omissions, the Products contain PFAS.

**Danger of PFAS in Cosmetic Products**

49.     There are thousands of PFAS in existence, but what all PFAS share is that they are comprised of multiple carbon-fluorine bonds, which are considered some of the strongest in chemistry.  As such, PFAS are highly persistent in the environment, humans, and even animals.

50.     PFAS are generally defined as either "long chain" or "short chain" and vary depending on the amounts of carbon atoms contained.  Long-chain PFAS contain seven or more carbon atoms; as opposed to short-chain PFAS, which contain seven or fewer carbon atoms.

51.     Some of the most dangerous long-chain PFAS include, PFOA and PFOS, which have been found at high rates throughout the world in the environment, humans, and animals.

52.     Short-chain PFAS, according to a study conducted by the U.S. Department of Health and Human Services' National Toxicology Program found that short-chain PFAS have the same adverse effects as long-chain compounds.  This means that short-term PFAS have negative impacts on the environment, humans, and animals.  The study also found that short-term PFAS can have even greater adverse effects on human organs, such as greater damage to the liver and thyroid hormone.[18]

53.     A common usage of PFAS is through the consumer product manufacturing processes to help products become resistant to water, grease, and stains; however, PFAS

---

[18] National Toxicology Program, *Per- and Polyfluoroalkyl Substances (PFAS)*, https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html (last accessed on Apr. 20, 2022).

still contain very dangerous adverse side effects even when used in this context since the inhalation of PFAS can also lead to negative health consequences.

54.     PFAS are also extremely soluble in water, which has led to harm to humans and animals that drink PFAS contaminated water.  Moreover, PFAS solubility is also leading to the discovery of PFAS in marine life.

55.     PFAS are harmful to humans in addition to the environment and persist and bioaccumulate over time in a person, meaning they can be harmful even at very low levels due to the accumulation over time.

56.     PFAS bind to proteins in the blood of humans exposed to the material and remain and persist over long periods of time.  Due to their unique chemical structure, PFAS bioaccumulate in the blood and body of exposed individuals.

57.     PFAS are often called "forever chemicals" because they don't break down in bodies or in the environment, so the more they get used, the more they build up and the bigger the risk they pose to our health.[19]

58.     Accordingly, scientists and health experts alike have become increasingly concerned about how PFAS impact human health, and the Centers for Disease Control and Prevention (hereinafter "CDC") outlined, "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[20]

59.     Additionally, many PFAS are associated with harmful and serious health effects, which include altered growth, negative effect on children's cognitive abilities, interference with the body's natural hormones, increased cholesterol levels, modulation

---

[19] https://www.marylandmatters.org/2022/05/03/maryland-pirg-whats-next-for-toxic-forever-chemicals/.
[20] Harvard T.H. Chan Sch. of Pub. Health, *Health risks of widely used chemicals may be underestimated* (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last accessed on Apr. 20, 2022).

of the immune system, testicular and kidney cancers, high uric acid levels, elevated liver enzymes, ulcerative colitis, and pregnancy induced hypertension.

60.    Of particular concern are cosmetics, such as the Products at issue herein, that are applied close to the eyes and the mouth, which could increase exposure and enhance risk due to increased absorption and ingestion.[21]

61.    PFAS in cosmetics can be directly absorbed into the human body through tear ducts, inhalation, and ingestion by applying the cosmetic products either on the eyelids, face, or lips.  The most common cosmetic products that result in this type of inhalation are through mascara products, foundation, and liquid lipstick.

62.    Defendants knew, or should have known, that PFAS remain or bioaccumulate in the human body while presenting significant health risks to humans.

**Banning of PFAS by International and Domestic Regulating Agencies**

63.    To combat the newfound risks posed by PFAS in cosmetic products, in June 2021, bi-partisan legislation was formed in the Senate and House to ban PFAS in cosmetic products, which included makeup, moisturizer, and perfume.[22]  This proposed legislation was supported by the scientific community.[23]

64.    Many domestic and world organizations have moved to ban PFAS or recognize PFAS as harmful toxins.  For example:

      a.    The Stockholm Convention on Persistent Organic Pollutants listed PFOS as an organic pollutant.[24]

---

[21] Heather D. Whitehead et al., *Fluorinated Compounds in North American Cosmetics*, Env't Sci. & Tech. Letters 2021, 8, 7, 538-44 June 15, 2021), https://pubs.acs.org/doi/10.1021/acs.estlett.1c00240?goto=supporting-info (last accessed on Apr. 20, 2022).
[22] *See* https://www.collins.senate.gov/newsroom/collins-blumenthal-introduce-bill-ban-pfas-chemicals-cosmetics; *see also* https://debbiedingell.house.gov/news/documentsingle.aspx?DocumentID=3097
[23] *Id.*
[24] Melissa Lim, Secretariat of the Basel, Rotterdam and Stockholm Conventions, "Phasing out PFOS under the Stockholm Convention," May 2014, https://www.oecd.org/chemicalsafety/portal/perfluorinated-chemicals/webinars/Presentation%203_Melisa.pdf (last accessed on Apr. 21, 2022).

b.  The US government announced a "PFAS Strategic Roadmap," which is an interagency plan to combat the continued use and release of PFAS.  As part of the Roadmap, the EPA committed to designating PFOA as "hazardous substances" under the Comprehensive Environmental Response, Compensation and Liability Act (hereinafter "CERCLA"), finalizing a PFAS reporting rule under the Toxic Substance Control Act ("hereinafter "TSCA") section 8(e); and publishing toxicity assessment for seven popularly used PFAS.[25]

c.  The Science Advisory Board (hereinafter "SAB") stated PFOA is a "likely carcinogen," and that evidence supports a label of "likely carcinogen" for PFOS.[26]

d.  The International Agency for Research on Cancer (hereinafter "IARC") has classified PFOA as possibly carcinogenic to humans.[27]

e.  The CDC has recognized that the exposure to PFAS may impact the immune system and reduce antibody response to vaccines. This is of particular concern to those that have received the COVID-19 vaccine to protect against the ongoing pandemic.[28]

65.  Even though PFAS are essentially unregulated at the federal level, over the past decade, a few states have recognized the risk posed by PFAS themselves and have enacted maximum contaminant levels regulating certain PFAS, including PFOA and PFOS, in drinking water.  For example:

a.  New Jersey's Department of Environmental Protection issued a preliminary drinking water guidance for PFOA.[29]

---

[25] EPA, United States Environmental Protection Agency, "PFAS Strategic Roadmap: EPA's Commitments to Action 2021-2024," https://www.epa.gov/pfas/pfas-strategic-roadmap-epas-commitments-action-2021-2024 (last accessed on Apr. 21, 2022).

[26] EPA, United States Environmental Protection Agency, "EPA Advances Science to Protect the Public from PFOA and PFOS in Drinking Water," November 16, 2021, https://www.epa.gov/newsreleases/epa-advances-science-protect-public-pfoa-and-pfos-drinking-water (last accessed on Apr. 21, 2022).

[27] IARC Monographs, "Some Chemicals Used As Solvents And In Polymer Manufacture," Volume 110, World Health Organization, 2017, file:///Users/ethanrubin/Downloads/mono110.pdf (last accessed on Apr. 25, 2022).

[28] ATSDR, Agency for Toxic Substances and Disease Registry, "Per- and Polyfluoroalkyl Substances (PFAS) and Your Health," https://www.atsdr.cdc.gov/pfas/health-effects/index.html#:~:text=CDC%2FATSDR%20recognizes%20that%20exposure,resistance%20(NTP%2C%202016). (last accessed on Apr. 21, 2022).

[29] New Jersey Department of Environmental Protection, "Contaminants of Emerging Concern," https://www.nj.gov/dep/srp/emerging-contaminants/#:~:text=Perfluorooctanoic%20Acid%20(PFOA)%3A,PFOA%20of%2014%20ng%2FL.(last accessed on Apr. 21, 2022).

    b.    New York took steps to regulate when and how PFAS could knowingly be released into the environment, including for firefighting purposes.  New York also enacted a law that prohibits the sale of food packaging containing PFAS.[30]

    c.    California passed the Toxic Free Cosmetics Act, which will prohibit the manufacturing and/or selling of any cosmetic products with any intentionally added amount of 24 specified chemicals, including PFAS.[31]  California's Office of Environmental Health Hazard Assessment (hereinafter "OEHHA") also listed PFOA as a carcinogen under proposition 65 and recently enacted legislation to remove PFAS in paper-based food packaging as well as the disclosure of the presence of PFAS in cookware like New York's regulation.[32]

    d.    Connecticut signed a bill into law banning the use of firefighting foam and food packaging that contains PFAS.[33]

    e.    Maine, Minnesota, Vermont, and Washington have recently enacted a law that will ban PFAS in nearly all products.[34]

66.    Regarding federal regulation, the use and labeling of cosmetic products is regulated by the Federal Food, Drug, and Cosmetics Act of 1938 and the Fair Packaging and Labeling Act of 1967.  Cosmetic products are defined as products that are "intended to be rubbed, poured, sprinkled, sprayed on, introduced into, or otherwise applied to the human body… for cleansing, beautifying, promoting, attractiveness, or altering the appearance."[35]

67.    However, except for a few color additives, the Food and Drug Administration (hereinafter "FDA") does not require cosmetics to obtain FDA approval prior to entering the

---

[30] NY Gen. Bus. L. § 391-u-2, accessible at: https://www.nysenate.gov/legislation/laws/GBS/391-U*2 (last accessed on Apr. 25, 2022); see also S8817/A4739.

[31] Cal. Toxic-Free Cosmetic Act (AB 2762 – Muratsuchi).

[32] OEHHA, "Notice to Interested Parties Chemical Listed Effective Feb. 25, 2022, As Known to the State of California to Cause Cancer: Perfluorooctanoic Acid," https://oehha.ca.gov/proposition-65/crnr/notice-interested-parties-chemical-listed-effective-february-25-2022-known-state, California Office of Environmental Health Hazard Assessment, California Office of Environmental Health Hazard Assessment (last accessed on Apr. 25, 2022); *see also* Cal. Safer Food Packaging and Cookware Act 2021, AB 1200.

[33] Public Act 21-191, *An Act Concerning the Use of PFAS Substances in Class B Firefighting B Foam*.

[34] Sec. 1.32 MRSA § 1731 5-A, *An Act To Protect the Environment and Public Health by Further Reducing Toxic Chemicals in Packaging*; *see also* Sec. 325F.075, *Food Packaging; PFAS*; *see also* S.20 (Act 36); *see also* HB 1694 – 2021-22.

[35] FD&C Act, sec. 201(i).

market, and federal regulation does not regulate the testing needed to determine the contents and/or safety of cosmetics.[36]

68.    Consequently, the only oversight is done on a voluntary basis on the part of cosmetic companies that wish to partake in registering the brand name and ingredient of their products.

**The Usage and Testing of PFAS in Cosmetic Products**

69.    In addition to PFAS being found in lipsticks, foundations, and mascara cosmetic products, PFAS can also be found in other cosmetic products that can be absorbed through skin contact, such as, lotions, cleansers, nail polish, shaving cream, eyeliner, and eyeshadow.

70.    PFAS are generally added to cosmetics to increase their long-term wearability and to make skin appear shimmery and smooth.[37]  PFAS can also increase product durability, product consistency, and water resistance.[38]

71.    In some instances, PFAS are indeed added to ingredients lists of cosmetic products, but even in such instances the amounts of PFAS contained therein is not disclosed.

72.    However, Defendant does not make mention of PFAS in its mascara products and instead even includes the representation on its website that the Products are "ophthalmologist tested" and "suitable for sensitive eyes," which makes a reasonable consumer believe they are purchasing a safe product, as depicted below:

---

[36] https://www.fda.gov/cosmetics/voluntary-cosmetic-registration-program
[37] https://www.smithsonianmag.com/smart-news/hold-blush-cosmetics-may-contain-toxic-forever-chemicals-180978036/#:~:text=PFAS%20are%20added%20to%20cosmetics,product%20consistency%20and%20water%20resistance.
[38] *Id.*



73.     In June 2021, Notre Dame University researchers published a peer-reviewed study ("Study") of 231 cosmetic products to determine whether the tested cosmetic products contained PFAS.  The test was conducted by utilizing a particle induced gamma ray emission to screen for total fluorine, which is the chemical indicator for PFAS in products.  Specifically, the Study tested

lip products, eye products, face products, foundations, mascaras, concealers, and eyebrow products, which were purchased from retailers.[39]

74.     The Study found that mascara products produced the largest range of total fluorine measurements.  Moreover, the three product categories with the highest proportion of fluorine concentrations were foundations, mascaras, and lip products, which is of significance since those are three cosmetic products applied to the face and have easiest access to human ingestion through inhalation and absorption.

75.     Even more concerning is that researchers concluded that high fluorine levels were detected in commonly advertised "water resistant" and/or "long lasting" foundations, liquid lipsticks, and waterproof mascaras, such as Defendant's Products.

76.     A further analysis of 29 foundations, mascaras, and lip products was also conducted and revealed that short-chain PFAS were commonly found in these cosmetic products. Additionally, researchers detected long-chain PFAS in these 29 cosmetic products.

77.     Of the 231 products tested, only 8% of products that were screened for total fluorine listed any PFAS as an ingredient and only 3% of the 29 products in the second round of testing listed any PFAS as an ingredient.

78.     The Study led the federal government to enact bipartisan legislation that would ban PFAS in cosmetic products, including makeup, moisturizer, and perfume.  The proposed legislation by U.S. Senator Susan Collins (R-ME) and Senator Richard Blumenthal (D-CT) also would direct the FDA to issue a proposed rule banning the intentional addition of PFAS in cosmetics within 270 days of the law's enactment and require a final rule to be issued 90 days thereafter.[40]  Similar legislation was also introduced in the House of Representatives by

Representatives Debbie Dingell (D-MI), Brian Fitzpatrick (R-PA), Annie Kuster (D-NH), and John Katko (R-NY).[41]

79.    Defendant's false, misleading, omissions, and deceptive misrepresentations regarding the ingredients of the Products are likely to continue to deceive and mislead reasonable consumers and the public, as they have already deceived and misled Plaintiffs and the Class Members.

80.    Defendant's concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies.  Consumers such as Plaintiffs and the Class Members are influenced by the ingredients listed.  Defendant knows that if it had not omitted that the Products contained or risked containing PFAS, then Plaintiffs and the Class would not have purchased the Products at all.

## JURISDICTION AND VENUE

81.    This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. section §1332(d) in that (1) this is a class action involving more than 100 class members; (2) Plaintiff Sonia Cauchi is a citizen of New York, Plaintiff Stephanie Branton is a citizen of New York, Defendant L'Oreal USA, Inc. is a citizen of Delaware and New York, and more than two-thirds of the class members reside outside the state of New York; and (3) the amount in controversy is in excess of $5,000,000, exclusive of interests and costs.

82.    This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the state of New York, contracts to supply goods within the state of New York, and supplies goods within the state of New York.

---

[41] https://debbiedingell.house.gov/news/documentsingle.aspx?DocumentID=3097

83.    Venue is proper because Defendant and many Class Members reside in the Southern District of New York, and throughout the state of New York.  A substantial part of the events or omissions giving rise to the Classes' claims occurred in this district.

**PARTIES**

**Plaintiffs**

84.    Plaintiff Sonia Cauchi is a citizen and resident of the state of New York.  Plaintiff resides in Queens, New York.  During the applicable statute of limitations period, Plaintiff purchased Defendant's Maybelline Great Lash Waterproof Mascara and L'Oreal Voluminous Waterproof Mascara Products that contained PFAS.  Plaintiff purchased Defendant's Products for her personal use during the Class Period in Queens, New York.  Plaintiff's most recent purchase was in 2022 from Target in Queens, New York.  Independent testing has confirmed that these Products contained PFAS.

85.    Plaintiff Stephanie Branton is a citizen and resident of the state of New York.  Plaintiff resides in Nassau County, New York.  During the applicable statute of limitations period, Plaintiff purchased Defendant's L'Oreal Voluminous Lash Paradise Waterproof Mascara and Maybelline Volum' Express the Falsies Waterproof Mascara Products that contained PFAS.  Plaintiff purchased Defendant's Products for her personal use during the Class Period in Nassau County, New York.  Plaintiff's most recent purchase was in 2022 from an online retailer.  Plaintiff purchased the Products in Nassau County, New York and had the Products shipped to her home in Nassau County, New York.  Independent testing has confirmed that these Products contained PFAS.

86.    Had Defendant not made the false, misleading, and deceptive representations and omissions regarding the Products containing PFAS, Plaintiffs would not have been willing to purchase the Products.  Plaintiffs purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products.  The Products Plaintiffs

received were not as represented because they contain or risked containing the known toxin PFAS. Accordingly, Plaintiffs were injured in fact and lost money as a result of Defendant's improper conduct.

**Defendant**

87.     Defendant, L'Oreal USA, Inc., is a Delaware corporation with its principal place of business in New York, New York.  L'Oreal USA, Inc. is one of the largest cosmetics companies in the world and responsible for producing some of the most popular cosmetic brands, including L'Oréal and Maybelline branded products.

88.     Defendant manufactures, markets, advertises, and distributes the Products throughout the United States.  Defendant created and/or authorized the false, misleading, and deceptive advertisements, packaging, and labeling of its Products.

## CLASS ALLEGATIONS

89.     Plaintiffs bring this matter on behalf of themselves and those similarly situated.  As detailed at length in this Complaint, Defendant orchestrated deceptive marketing and labeling practices.  Defendant's customers were uniformly impacted by and exposed to this misconduct. Accordingly, this Complaint is uniquely situated for class-wide resolution.

90.     The Class is defined as all consumers who purchased the Products anywhere in the United States during the Class Period.

91.     Plaintiffs also seek certification, to the extent necessary or appropriate, of a subclass of individuals who purchased the Products in the state of New York at any time during the Class Period (the "New York Subclass").

92.     The Class and New York Subclass shall be referred to collectively throughout the Complaint as the Class.

93.     The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

94.     <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable.  Plaintiffs believe that there are thousands of consumers in the Class and the New York Class who are Class Members as described above who have been damaged by Defendant's deceptive and misleading practices.

95.     <u>Commonality</u>: The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

    a.   Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

    b.   Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant has engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of its Products;

    c.   Whether Defendant made false and/or misleading statements and omissions to the Class and the public concerning the contents of its Products;

    d.   Whether Defendant's false and misleading statements and omissions concerning its Products were likely to deceive the public; and

    e.   Whether Plaintiffs and the Class are entitled to money damages under the same causes of action as the other Class Members?

96.     <u>Typicality</u>: Plaintiffs are members of the Class.  Plaintiffs' claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased Defendant's Products.  Plaintiffs are entitled to relief under the same causes of action as the other Class Members.

97.     <u>Adequacy</u>: Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the Class Members they seek to represent, their consumer fraud claims are common to all members of the Class, they have a strong interest in vindicating their rights, they have retained counsel competent and experienced in complex class action litigation, and counsel intends to vigorously prosecute this action.

98.     <u>Predominance</u>: Pursuant to Rule 23(b)(3), common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class.  The Class issues fully predominate over any individual issues because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's deceptive and misleading marketing and labeling practices.

99.     <u>Superiority</u>: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

> a.     The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;
>
> b.     The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claims, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;
>
> c.     When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;
>
> d.     This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;
>
> e.     Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;
>
> f.     This class action will assure uniformity of decisions among Class Members;
>
> g.     The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h.     Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action; and

i.     It would be desirable to concentrate in this single venue the litigation of all Class Members who were induced by Defendant's uniform false advertising to purchase its Products.

100.    Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CLAIMS

### FIRST CAUSE OF ACTION
### VIOLATION OF NEW YORK GBL § 349
**(On Behalf of Plaintiffs and New York Subclass Members)**

101.    Plaintiffs repeat and reallege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

102.    New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

103.    The conduct of Defendant's alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiffs and the New York Subclass Members seek monetary damages against Defendant, enjoining them from inaccurately describing, labeling, marketing, and promoting the Products.

104.    There is no adequate remedy at law.

105.    Defendant misleadingly, inaccurately, and deceptively advertise and market its Products to consumers.

106.    Defendant's improper consumer-oriented conduct—including failing to disclose that the Products have or risk containing PFAS—is misleading in a material way in that it, *inter*

*alia*, induced Plaintiffs and the New York Subclass Members to purchase Defendant's Products and to use the Products when they otherwise would not have.  Defendant made the untrue and/or misleading statements and omissions willfully, wantonly, and with reckless disregard for the truth.

107.   Plaintiffs and the New York Subclass Members have been injured inasmuch as they purchased products that were mislabeled, unhealthy, and entirely worthless.   Accordingly, Plaintiffs and the New York Subclass Members received less than what they bargained and paid for.

108.   Defendant's advertising and Products' packaging and labeling induced Plaintiffs and the New York Subclass Members to buy Defendant's Products.

109.   Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiffs and the New York Subclass Members have been damaged thereby.

110.   As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiffs and the New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**VIOLATION OF NEW YORK GBL § 350**
**(On Behalf of Plaintiffs and the New York Subclass Members)**

111.   Plaintiffs repeat and reallege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

112.   N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

113.   N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

114.    Defendant's labeling and advertisements contain untrue and materially misleading statements and omissions concerning its Products inasmuch as Defendant misrepresents that the Products are safe for use and don't list that the Products contain or risk containing PFAS.

115.    Plaintiffs and the New York Subclass Members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and purchased Products that were mislabeled. Accordingly, Plaintiffs and the New York Subclass Members received less than what they bargained and paid for.

116.    Defendant's advertising, packaging, and Products' labeling induced Plaintiffs and the New York Subclass Members to buy Defendant's Products.

117.    Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

118.    Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

119.    Defendant made the material misrepresentations described in this Complaint in its advertising and on the Products' packaging and labeling.

120.    Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.   Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

121.     As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiffs and New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
#### (On Behalf of Plaintiffs and All Class Members)

122.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

123.     Defendant provided Plaintiffs and Class Members with an express warranty in the form of written affirmations of fact promising and representing that the Products contain what they say they contain and are safe for use.  These express affirmations include, but are not limited to, the ingredient lists and labels that attest to the safety of the Products but fail to include that the Products contained or risked containing PFAS.

124.     The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

125.     These affirmations of fact became part of the basis for the bargain and were material to Plaintiffs and Class Members' transactions.

126.     Plaintiffs and Class Members reasonably relied upon Defendant's affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendant's Products.

127.     Defendant knowingly breached the express warranties by including PFAS in the Products sold to Plaintiffs and the Class without properly notifying them of its inclusion or risk of inclusion in the Products.

128.     Within a reasonable time after it knew or should have known, Defendant did not change the Products' labels to include PFAS in the ingredient list.

129.    Defendant thereby breached the following state warranty laws:

      a.        Code of Ala. § 7-2-313;

      b.        Alaska Stat. § 45.02.313;

      c.        A.R.S. § 47-2313;

      d.        A.C.A. § 4-2-313;

      e.        Cal. Comm. Code § 2313;

      f.        Colo. Rev. Stat. § 4-2-313;

      g.        Conn. Gen. Stat. § 42a-2-313;

      h.        6 Del. C. § 2-313;

      i.        D.C. Code § 28:2-313;

      j.        Fla. Stat. § 672.313;

      k.        O.C.G.A. § 11-2-313;

      l.        H.R.S. § 490:2-313;

      m.        Idaho Code § 28-2-313;

      n.        810 I.L.C.S. 5/2-313;

      o.        Ind. Code § 26-1-2-313;

      p.        Iowa Code § 554.2313;

      q.        K.S.A. § 84-2-313;

      r.        K.R.S. § 355.2-313;

      s.        11 M.R.S. § 2-313;

      t.        Md. Commercial Law Code Ann. § 2-313;

      u.        106 Mass. Gen. Laws Ann. § 2-313;

      v.        M.C.L.S. § 440.2313;

      w.        Minn. Stat. § 336.2-313;

      x.        Miss. Code Ann. § 75-2-313;

y.      R.S. Mo. § 400.2-313;

z.      Mont. Code Anno. § 30-2-313;

aa.     Neb. Rev. Stat. § 2-313;

bb.     Nev. Rev. Stat. Ann. § 104.2313;

cc.     R.S.A. 382-A:2-313;

dd.     N.J. Stat. Ann. § 12A:2-313;

ee.     N.M. Stat. Ann. § 55-2-313;

ff.     N.Y. U.C.C. Law § 2-313;

gg.     N.C. Gen. Stat. § 25-2-313;

hh.     N.D. Cent. Code § 41-02-30;

ii.     II. O.R.C. Ann. § 1302.26;

jj.     12A Okl. St. § 2-313;

kk.     Or. Rev. Stat. § 72-3130;

ll.     13 Pa. Rev. Stat. § 72-3130;

mm.     R.I. Gen. Laws § 6A-2-313;

nn.     S.C. Code Ann. § 36-2-313;

oo.     S.D. Codified Laws, § 57A-2-313;

pp.     Tenn. Code Ann. § 47-2-313;

qq.     Tex. Bus. & Com. Code § 2.313;

rr.     Utah Code Ann. § 70A-2-313;

ss.     9A V.S.A. § 2-313;

tt.     Va. Code Ann. § 59.1-504.2;

uu.     Wash. Rev. Code Ann. § 6A.2-313;

vv.     W. Va. Code § 46-2-313;

ww.     Wis. Stat. § 402.313; and

xx.    Wyo. Stat. § 34.1-2-313.

130.    As a direct and proximate result of Defendant's breach of the express warranties, Plaintiffs and Class Members were damaged in the amount of the price they paid (or premium paid) for the Products, in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**FRAUDULENT CONCEALMENT**
**(On Behalf of Plaintiffs and All Class Members)**

131.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

132.    Defendant concealed and failed to disclose on the Products' packaging and labeling the material fact the Products contained or risked containing PFAS, and that the Products were not safe or healthy for use.

133.    As discussed at great length above, it has been known since the 1950's that PFAS are harmful chemicals to humans, animals, and the environment.  The EPA, CDC and many other groups and publications have further reported on the potential risks and dangers of PFAS. Consequently, Defendant knew or should have known that PFAS are dangerous, and concealing this known fact is detrimental to the consumer.

134.    Defendant has a duty to disclose that the Products contained or risked containing PFAS; however, Defendant did not make this disclosure.

135.    Plaintiffs and the Class all paid a premium for the Products based upon the way it was represented, which did not include the inclusion of PFAS, and products that are tainted with PFAS are not worth a premium to a reasonable consumer.

136.    Defendant had superior knowledge or means of knowledge available to them and knew that Plaintiffs and Class Members would rely upon the representations and omissions of Defendant regarding the quality and ingredients of its Products.  Consumers lack the meaningful

ability to test or independently ascertain or verify whether a product contains PFAS, especially at the point of sale.

137.   Defendant's concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies.  Consumers such as Plaintiffs and the Class Members are influenced by the ingredients listed, as well as any warnings (or lack thereof) on the products they buy.  Defendant knows that if it had not omitted that the Products contained or risked containing PFAS, then Plaintiffs and the Class would not have agreed to pay a premium price for the Products, or wouldn't have purchased the Products at all; however, Defendant wanted to increase sales and profits.

138.   Defendant's concealment misled Plaintiffs and the Class as to the true nature of what they were buying and putting onto and into their bodies.

139.   Defendant fraudulently concealed that the Products contained or risked containing PFAS.  Consequently, Plaintiffs and the other members of the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and All Class Members in the Alternative)**

140.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

141.   Plaintiffs, on behalf of themselves and consumers nationwide, bring a claim for unjust enrichment.

142.   Defendant's conduct violated, *inter alia*, state and federal law by manufacturing, advertising, marketing, and selling the Products while misrepresenting and omitting material facts.

143.   Defendant's unlawful conduct, as described in this Complaint, allowed Defendant to knowingly realize substantial revenues from selling the Products at the expense of, and to the detriment or impoverishment of, Plaintiffs and Class Members and to Defendant's benefit and

enrichment.  Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

144.   Plaintiffs and Class Members conferred significant financial benefits and paid substantial compensation to Defendant for the Products, which were not as Defendant represented them to be.

145.   It is inequitable for Defendant to retain the benefits conferred by Plaintiffs and Class Members' overpayments.

146.   Plaintiffs and Class Members seek establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

(a) Declaring this action to be a proper class action and certifying Plaintiffs as representatives of the Class under Rule 23 of the FRCP;

(b) Awarding monetary damages and treble damages;

(c) Awarding statutory damages of $50 per transaction, and treble damages for knowing and willful violations, pursuant to N.Y. GBL § 349;

(d) Awarding statutory damages of $500 per transaction pursuant to N.Y. GBL § 350;

(e) Awarding punitive damages;

(f) Awarding Plaintiffs and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys, experts, and reimbursement of Plaintiffs' expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

Dated: May 13, 2022

THE SULTZER LAW GROUP P.C.

By:     Jason P. Sultzer /s/
_____
Jason P. Sultzer, Esq.
Joseph Lipari, Esq.
Daniel Markowitz, Esq.
270 Madison Avenue, Suite 1800
New York, NY 10016
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
liparij@thesultzerlawgroup.com
markowitzd@thesultzerlawgroup.com

David C. Magagna Jr., Esq.
Charles E. Schaffer, Esq.
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
dmagagna@lfsblaw.com
cschaffer@lfsblaw.com

*Counsel for Plaintiffs and the Class*